**SONS OF CONFEDERATE VETERANS, INCORPORATED, a Tennessee Corporation, by its Commander–in–Chief Patrick J. GRIFFIN; Virginia Division of Sons of Confederate Veterans, Incorporated, a Virginia Corporation, by its Commander Robert W. Barbour, Sr., Plaintiffs–Appellees,**

v.

**COMMISSIONER OF THE VIRGINIA DEPARTMENT OF MOTOR VEHICLES, in his official capacity, Defendant–Appellant,**

and

**Commonwealth of Virginia, whose agents and officers enacted and will enforce, on its behalf, Va.Code Ann. 46.2–746.22; James S. Gilmore, III, Governor, as Governor of the Commonwealth of Virginia, in his official capacity; Shirley Ybarra, as Secretary of the Department of Transportation of the State of Virginia, in her official capacity, Defendants.**

No. 01–1242.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 31, 2001.

Decided April 29, 2002.

**ARGUED:** William Henry Hurd, Solicitor General, Office of the Attorney General, Richmond, Virginia, for Appellant. Arthur Patrick Strickland, Strickland & Harden, P.C., Roanoke, Virginia, for Appellees. **ON BRIEF:** Randolph A. Beales, Acting Attorney General, Jeffrey A. Spencer, Assistant Attorney General, Alison P. Landry, Assistant Attorney General, Office of the Attorney General, Richmond, Virginia, for Appellant. Steven H. Aden, The Rutherford Institute, Charlottesville, Virginia, for Appellees.

Before WILLIAMS and TRAXLER, Circuit Judges, and HOWARD, United States District Judge for the Eastern District of North Carolina, sitting by designation.

Affirmed by published opinion. Judge WILLIAMS wrote the opinion, in which Judge TRAXLER and Judge HOWARD joined.

WILLIAMS, Circuit Judge.

This appeal arises out of a dispute regarding the constitutionality of a provision in the Virginia statute authorizing the issuance of special license plates to members of the Sons of Confederate Veterans [1] (SCV). In contrast to other Virginia statutes authorizing special plates for members or supporters of various organizations, this statute contains a restriction (the logo restriction) providing that "[n]o logo or emblem of any description shall be displayed or incorporated into the design of license plates issued under this section." Va.Code Ann. § 46.2–746.22 (Michie Supp. 2000).[2] The SCV are thus prohibited by the logo restriction from receiving special plates bearing the symbol of their organization, which includes the Confederate flag. Richard Holcomb, Commissioner of

---

1. The Sons of Confederate Veterans is a Tennessee non-profit corporation. *Sons of Confederate Veterans, Inc. v. Holcomb,* 129 F.Supp.2d 941, 942 (W.D.Va.2001). The members of the Sons of Confederate Veterans are men "who can prove genealogically that one of their ancestors served honorably in the armed forces of the Confederate States of America." (Br. of Appellee at 4.)

2. The statute states in full:

On receipt of an application therefor and written evidence that the applicant is a member of the Sons of Confederate Veterans, the Commissioner shall issue special license plates to members of the Sons of Confederate Veterans. No logo or emblem of any description shall be displayed or incorporated into the design of license plates issued under this section.

Va.Code Ann. § 46.2–746.22 (Michie 2000).

the Virginia Department of Motor Vehicles (the Commissioner), appeals from a district court's order granting summary judgment to the SCV on their claim that the logo restriction violates the First and Fourteenth Amendments to the United States Constitution and granting an injunction to the SCV prohibiting the Commissioner from enforcing the restriction. Because we agree with the district court that the logo restriction violates the Constitution, we affirm.

## I.

The General Assembly of Virginia has created a program through which "special" Virginia license plates may be issued to members and supporters of various organizations or groups. Such plates must be specifically authorized by statute. Va. Code Ann. § 46.2–725 (Michie 1998). Generally, the plates bear the organization's logo and motto in addition to letters and numbers as found on other Virginia license plates. Ordinarily, a group or organization that would like to have a special license plate made available to its members contacts a member of the General Assembly to request that a bill be introduced which, if enacted, would authorize the issuance of a special plate. The General Assembly has authorized well over one hundred special plates in this fashion, a significant number of them for private organizations or associations.

The Virginia statute that created the special license plate program gives the Commissioner authority to "prescribe" the design of any special plate, stating that "[a]ll special license plates issued pursuant to this article shall be of designs prescribed by the Commissioner...." Va. Code Ann. § 46.2–725(B)(3) (Michie 1998). Section 46.2–725(B)(3) does not merely create discretion in the Commissioner to approve or reject plate designs; it also

lays out substantive standards for those plate designs, requiring that they "bear unique letters and numerals, clearly distinguishable from any other license plate designs, and be readily identifiable by law enforcement personnel." *Id.*

The record indicates that special plate designs ordinarily are settled upon by a cooperative process between the Commissioner, represented by the Department of Motor Vehicles (DMV), and the group authorized to receive a special plate. The group is invited in a letter from the DMV to submit a design through a designated "sponsor," a person authorized to communicate on the group's behalf with the DMV regarding the plate. The letter instructs the sponsor to include "electronic media art of the logo and legend for the plate" with its submission. (J.A. at 104) (DMV form letter to plate sponsors). In addition to these instructions, "Special License Plate Design Criteria" are provided, which specifically state that "[y]ou can use your organization's logo or create a logo to be placed on the plate." (J.A. at 106.)

## II.

The SCV brought this action in the United States District Court for the Western District of Virginia by and through their Commander in Chief, Patrick J. Griffin, seeking a declaration that the logo restriction is invalid under the First, Fifth, and Fourteenth Amendments to the United States Constitution, an injunction requiring the Commissioner to issue special license plates bearing the logo of the SCV, including the Confederate flag, to those members of the SCV who request them, and attorney's fees and costs pursuant to 42 U.S.C.A. § 1988. The SCV and the Commissioner filed cross-motions for summary judgment. The district court granted the SCV's motion and denied the Commissioner's motion on January 18, 2001.

Concluding that the logo restriction violated the First Amendment as incorporated into the Fourteenth, the district court declared it invalid on that ground. *Sons of Confederate Veterans, Inc. v. Holcomb,* 129 F.Supp.2d 941, 947 (W.D.Va.2001). The district court then entered an injunction enjoining the Commissioner from enforcing the logo restriction and requiring the issuance of the special plates with the design sought by the SCV. The district court did not rule on the issues of costs or attorney's fees, stating that those matters would be taken up at a later date. *Id.* at 949.

In support of its rulings, the district court made several findings. First, it found that plates authorized for private organizations under Virginia's special license plate program constitute private, rather than government, speech. *Id.* at 945 ("the design of [special plates] honoring private entities is the speech of those entities"). The district court then analyzed the effect of the logo restriction on the SCV's speech rights, concluding that the prohibition of any logo or emblem on the SCV's special plate discriminates on the basis of viewpoint and is thus invalid. *Id.* at 947. The district court also conducted an analysis of the special license plate program as a forum for speech, concluding that it would constitute a "designated public forum" under such analysis.[3] *Id.* at 947–49. The district court found that strict scrutiny would be applied to restrictions in that forum, other than reasonable time, place, and manner restrictions, and that the logo prohibition could not survive such scrutiny.

As to the appropriate remedy for the violation, the district court found that the two sentences of section 46.2–746.22 are severable under Virginia law, and that the second, comprising the logo restriction, could thus be invalidated while leaving the first intact. *Id.* at 949. The district court found alternatively that even if the second sentence could not be severed from the first (and consequently the whole statute authorizing a special plate for the SCV would have to be invalidated), it would act pursuant to its inherent equitable powers to compel the Commissioner to comply with the requirements of the first sentence of § 46.2–746.22—that is, to issue special plates to the SCV containing their logo. To invalidate the authorizing statute entirely, the district court found, would give effect to viewpoint discrimination in violation of the First Amendment. *Id.* The Commissioner timely noted this appeal.

The Commissioner's argument on appeal has three parts. First, the Commissioner contends that the special plate authorized for the SCV, and indeed all the special plates authorized in Virginia, are instances of "government speech." Second, the Commissioner argues that even if the special plates contain private speech, that speech has not been abridged impermissibly in violation of the First Amendment because the logo restriction is a reasonable subject matter limitation, rather than a bar to expression of a particular viewpoint. Third and finally, the Commissioner contends that if section 46.2–746.22 is unconstitutional, the district court erred when it severed what it found to be the offending portion of the authorizing statute, thereby creating a statute that the General Assembly did not pass and would not have passed.

---

**3.** The district court stated that the forum analysis it conducted was not necessary to its holding because "impermissible viewpoint discrimination is sufficient and independent grounds for striking down the ban at issue, regardless of the forum in which the expression occurs." *Sons of Confederate Veterans,* 129 F.Supp.2d at 947.

 We address each of these arguments in turn, reviewing de novo the grant of the motion for summary judgment. *Higgins v. E.I. DuPont de Nemours and Co.*, 863 F.2d 1162, 1167 (4th Cir.1988). In reviewing the record, we "draw all reasonable inferences in favor of the non-moving party, ... and we may not make credibility determinations or weigh the evidence." *Edell & Assoc., P.C. v. Law Offices of Peter G. Angelos*, 264 F.3d 424, 435–36 (4th Cir.2001). Where the Government imposes viewpoint-based restrictions, we evaluate the restrictions pursuant to strict scrutiny. *American Life League, Inc. v. Reno*, 47 F.3d 642, 648 (4th Cir.1995). "To pass this test a law must be necessary to serve compelling governmental interests by the least restrictive means available." *Id.* (citing *R.A.V. v. St. Paul*, 505 U.S. 377, 395, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992)).[4]

### III.

With these background principles in mind, we turn first to the question of whether the speech on the special plates authorized by the Virginia legislature is private speech or "government speech." The Commissioner contends that any expressive content on a Virginia special plate is a "statement" by the Commonwealth about the group represented on the plate. In this vein, the Commissioner emphasizes that the General Assembly authorized the SCV's special plate to "honor" that organization. Because these special plates constitute government speech, the Commissioner argues, traditional First Amendment inquiries do not apply, in light of the settled principle that when the government speaks, it may craft its message and cannot be forced to formulate or subsidize a message it does not choose. Accordingly, he argues that because the SCV's special plates constitute government speech, they are not subject to First Amendment challenge on the grounds raised by the SCV.

### A.

 It is well established that "the government can speak for itself." *Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 229, 120 S.Ct. 1346, 146 L.Ed.2d 193 (2000). Pursuant to its many and varied functions, "[t]he government is entitled 'to promote particular messages' ..., and to take legitimate and appropriate steps to ensure that its messages are neither garbled nor distorted"— that is, the government may limit the

---

4. The Supreme Court has indicated that a viewpoint-based restriction of private speech rarely, if ever, will withstand strict scrutiny review. *See, e.g., R.A.V. v. St. Paul*, 505 U.S. 377, 395–96, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) (holding that a bias-motivated disorderly conduct ordinance's viewpoint discrimination was not justified on the ground that the ordinance was narrowly tailored to serve compelling state interest in ensuring basic human rights of groups historically discriminated against because a viewpoint-neutral ordinance would have the same beneficial effect). Thus, viewpoint-based restrictions of private speech are presumptively unconstitutional. *Id.* at 382, 112 S.Ct. 2538. We are mindful that the Supreme Court has not hewn unfailingly to the structured approach of strict scrutiny review when evaluating viewpoint-based restrictions under forum analysis, discussed *infra*, Part IV.B. *See Rosenberger*, 515 U.S. at 829, 115 S.Ct. 2510 (noting that "[t]he government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction" and that First Amendment principles "forbid[ ] the State to exercise viewpoint discrimination, even when the limited public forum is one of its own creation"). It is nevertheless clear that viewpoint discrimination in a forum for private speech cannot stand, if ever, absent a compelling justification and narrow tailoring. As we will discuss, this principle is sufficient to resolve the issues before us.

scope of the message it sends. *Griffin v. Dep't of Veterans Affairs*, 274 F.3d 818, 822 (4th Cir.2001) (internal citations omitted). The government may promote its policies and positions either through its own officials or through its agents. This authority to "speak" necessarily carries with it the authority to select from among various viewpoints those that the government will express as its own. *See Rust v. Sullivan*, 500 U.S. 173, 194, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) (noting government's authority to select and fund speech in a non-neutral way in order to send its own message).

In *Rust*, the Supreme Court held that the federal government constitutionally could prohibit doctors from providing counseling or other information regarding abortion to patients while treating those patients in a program set up and funded by the federal government. The doctors' right to speak was not offended by the limitation imposed by the federal government because the government had merely chosen to fund one activity—counseling not including discussion of abortion—to the exclusion of another—counseling including discussion of abortion. *See id.* at 198–99, 111 S.Ct. 1759. Although *Rust* is considered to have been one of the first cases recognizing the government speech doctrine, *see Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 541, 121 S.Ct. 1043, 149 L.Ed.2d 63 (2001), nowhere in *Rust* did the Court rely explicitly on the government speech rationale.[5] Rather, the Court simply stated that government is free to fund chosen activities to the exclusion of others. *Id.; see also Griffin v. Dep't of Veterans Affairs*, 274 F.3d 818, 822 (4th Cir.2001) (noting that the government as speaker "is entitled to promote particular messages"). In later cases, however, the Court consistently has interpreted *Rust* as indicating that the doctors' funded counseling activities were government speech, and that where the government is the speaker, it may choose and tailor its message. *Velazquez*, 531 U.S. at 541, 121 S.Ct. 1043 (stating that while "[t]he Court in *Rust* did not place explicit reliance on the rationale that the counseling activities of the doctors

**5.** Indeed, the proposition that *Rust* itself involved government speech is not universally accepted, *see Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 554, 121 S.Ct. 1043, 149 L.Ed.2d 63 (2001) ("If the private doctors' confidential advice to their patients at issue in *Rust* constituted 'government speech,' it is hard to imagine what subsidized speech would *not* be government speech.") (Scalia, J., dissenting). There also is uncertainty regarding the government's role as speaker, in certain limited circumstances, when it selects from among private speakers those whose messages it will favor or subsidize. When it does so, at least in the contexts of excellence-based funding decisions and the exercise of "editorial" discretion in a forum necessarily restricted by the medium of communication, the government's actions may be subject to somewhat less restrictive First Amendment limitations than would otherwise apply. *See Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 585, 118 S.Ct. 2168, 141 L.Ed.2d 500 (1998) (noting that government, in setting criteria to be considered in arts funding decisions, could constitutionally differentiate between applicants based on, inter alia, respect for "general standards of decency" because such considerations are "a consequence of the nature of arts funding," which, because of its inherently subjective excellence-based character, makes "absolute neutrality ... simply 'inconceivable'") (internal citation omitted); *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 681–83, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998) (noting that government, acting as editor in public television broadcasting context, could constitutionally deny access to a televised political debate to a candidate on the basis that he did not have significant public support because the restriction was reasonable in light of the need to avoid "cacophony" in the debate; to require that access be granted to all speakers, regardless of the level of support they enjoy, would lead public broadcasters to eschew televised debates altogether). Neither of these particular circumstances is present here.

... amounted to governmental speech[,] when interpreting the holding in later cases, ... we have explained *Rust* on this understanding").

 Thus, even ordinarily impermissible viewpoint-based distinctions drawn by the government may be sustained where the government itself speaks or where it uses private speakers to transmit its message.[6] *Id.* (citing *Southworth,* 529 U.S. at 229, 120 S.Ct. 1346, for the proposition that "viewpoint-based funding decisions can be sustained in instances in which the government itself is the speaker," and *Rosenberger v. Rector and Visitors of Univ. of Va.,* 515 U.S. 819, 833, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995), for the proposition that such distinctions may be sustained in "instances, like *Rust,* in which the government 'used private speakers to transmit specific information pertaining to its own program.'"). The rationale behind the government's authority to draw otherwise impermissible viewpoint distinctions in the government speech context is the accountability inherent in the political process:

> When the government speaks, for instance to promote its own policies or to advance a particular idea, it is, in the end, accountable to the electorate and the political process for its advocacy. If the citizenry objects, newly elected officials later could espouse some different or contrary position.

*Southworth,* 529 U.S. at 235, 120 S.Ct. 1346. In other words, where the government itself is responsible, and therefore accountable, for the message that its

speech sends, the danger ordinarily involved in governmental viewpoint-based choices is not present.

### B.

No clear standard has yet been enunciated in our circuit or by the Supreme Court for determining when the government is "speaking" and thus able to draw viewpoint-based distinctions, and when it is regulating private speech and thus unable to do so. Indeed, as we have noted, there exists some controversy over the scope of the government speech doctrine. Several other circuits, however, have addressed the question in contexts that are instructive here. Our sister circuits have examined (1) the central "purpose" of the program in which the speech in question occurs; (2) the degree of "editorial control" exercised by the government or private entities over the content of the speech; (3) the identity of the "literal speaker"; and (4) whether the government or the private entity bears the "ultimate responsibility" for the content of the speech, in analyzing circumstances where both government and a private entity are claimed to be speaking. *See Wells v. City and County of Denver,* 257 F.3d 1132, 1141 (10th Cir.), *cert. denied,* —— U.S. ——, 122 S.Ct. 469, 151 L.Ed.2d 384 (2001) (analyzing these four factors in considering whether a sign listing the private sponsors of a public holiday display constituted government speech); *Knights of the Ku Klux Klan v. Curators of the Univ. of Mo.,* 203 F.3d 1085 (8th Cir.), *cert. denied,* 531 U.S. 814, 121 S.Ct. 49, 148 L.Ed.2d 18 (2000) (analyzing the same factors in considering

---

**6.** While viewpoint-based distinctions drawn by the government are permissible where it sends its own message through its own program, as in *Rust,* such distinctions are ordinarily not permissible where the government exercises editorial discretion to choose from among private messages those it will favor or

subsidize. *See Forbes,* 523 U.S. at 676–77, 118 S.Ct. 1633 (noting that viewpoint-based editorial decisions regarding which candidates' messages should be included in a political debate broadcast on public television would have been unconstitutional).

whether announcements of sponsors' names and brief messages from sponsors on public radio station constituted government speech); *see also Downs v. Los Angeles Unified Sch. Dist.*, 228 F.3d 1003, 1011 (9th Cir.2000), *cert. denied*, 532 U.S. 994, 121 S.Ct. 1653, 149 L.Ed.2d 636 (2001) (applying similar reasoning in considering whether postings to school bulletin boards were government or private speech). We find the recent approaches of our sister circuits instructive here. Although we do not conclude that the factors relied on in *Knights of the KKK, Downs,* and *Wells* constitute an exhaustive or always-applicable list, we believe that examination of those factors in this context, in conjunction with consideration of applicable Supreme Court precedent, resolves the government speech issue before us.[7]

## C.

### 1.

 Turning to application of the factors enumerated by our sister circuits to the case before us, we first consider the "purpose" of the special plate program. While the purpose of a government program or subsidy that implicates speech interests will in some cases be apparent, *see Wells*, 257 F.3d at 1141 (citing evidence that the purpose of the sign asserted to be government speech was "to thank the sponsors and the citizens for the support of the cost of the display"), this will not always be the case. Here, for instance, the Commissioner takes the position that the purpose of the special plate program is to serve as a vehicle for the expression of

government messages honoring those groups for which it authorizes special plates. The SCV, on the other hand, contend that the purpose of the program is to allow individuals to display their association with and express their pride in the messages or goals of the group for which a special plate is authorized.

Examining the special plate program as a whole, we believe neither party is entirely correct in its argument about the purposes of the program. Several considerations lead us to conclude that the purpose of the special plate program primarily is to produce revenue while allowing, on special plates authorized for private organizations, for the private expression of various views. First, the fees collected through the special plate program are, as the Commissioner concedes, "a source of additional revenue" for Virginia. (Br. of Appellant at 50.) Indeed, in fiscal year 2000, the net revenue from special plates totaled nearly $4.5 million. The Commissioner himself cites this revenue as a purpose of the program. While the mere fact that the program produces revenue for Virginia is not conclusive as to its purpose, the net financial impact of the program on the Commonwealth's fisc does indicate that the General Assembly here is not making the kind of selective *funding* decisions involved in cases like *Rust* and *Finley*.

Second, the legislation creating the special plate program imposes a fee structure that suggests the program's revenue-producing aim. Section 46.2–725 of the Virgi-

---

7. In considering the approaches taken by our sister circuits, we focus primarily on the factors enunciated in *Wells* and *Knights of the KKK* because *Downs,* while relevant in that the question of whether the speech was government speech or private speech was squarely before the court, decided the constitutionality of a restriction in the school context, a

context where First Amendment inquiries may be colored by recognition of the special necessities of the educational environment. *See Wells,* 257 F.3d at 1141 (noting and describing *Downs,* but relying primarily on factors enunciated in *Knights of the KKK* because of the "special characteristics of the school environment" present in *Downs* ).

nia Code, which authorizes special plates, states that

> [n]o license plates provided for in this article shall be issued until the Commissioner receives at least 350 prepaid applications therefor. In the event that 350 or more prepaid applications have not been received on or before the last day of the third year from the date the license plates were last authorized, no such license plates shall be issued unless the license plates are reauthorized by the General Assembly.

Va.Code Ann. § 46.2–725(B)(1). The supposed "honor" bestowed on a group for whom a special license plate is authorized, in other words, is conditioned on the willingness of 350 private persons to pay extra to obtain the plate expressing the "honor." If the General Assembly intends to speak, it is curious that it requires the guaranteed collection of a designated amount of money from private persons before its "speech" is triggered.[8] It is not the case, in other words, that the special plate program only incidentally produces revenue for the Commonwealth. The very structure of the program ensures that only special plate messages popular enough among private individuals to produce a certain amount of revenue will be expressed.

Third, the special plate authorized for the SCV is available only to members of the SCV who can provide "written evidence" that they are members of the group. Va.Code Ann. § 46.2–746.22. This type of restriction is common among the statutes authorizing special plates in Virginia. *E.g.*, Va.Code Ann. § 46.2–738.1 (Michie 1998) (requiring written evidence that the applicant is a member of the American Radio Relay League for issuance of the special plate recognizing that group); § 46.2–741 (Michie 1998) (requiring the same for survivors of the attack on Pearl Harbor); § 46.2–747.1 (Michie 1998) (requiring the same for members of the Gold Wing Road Riders Association). These restrictions suggest that the special plates to which they apply are intended by the General Assembly to allow the authorized recipients to express their pride in membership in an organization while facilitating the group's speech. If non-members cannot obtain the plates, those motorists who have them send a personal message by carrying the plates on their vehicles, because the plates identify them as members of the organization. *Cf. Lewis v. Wilson*, 253 F.3d 1077, 1079 (8th Cir.2001) (concluding that the purpose of any forum created by a vanity license plate program allowing individuals to select the combinations of numbers and letters appearing on their plates was "to give vent to the personality, and reveal the character or views of the plate's holder"), *cert. denied, Fischer v. Lewis*, —— U.S. ——, 122 S.Ct. 1536, 152 L.Ed.2d 464 (2002).

2.

Turning to the "editorial control" exercised by the Commonwealth over the

---

**8.** It might be argued that the special plate program works by authorizing a variety of state-approved, if not state-created, messages and allowing a private person to decide whether to select a plate expressing a particular one, and that it is therefore the equivalent of a program subsidizing the promulgation of government-chosen messages. *Cf. Rust*, 500 U.S. at 193, 111 S.Ct. 1759 (holding that the government may subsidize a program to express selected views). This contention is un-persuasive, however, in light of the revenue produced by special plates and section 46.2–725's fee structure. To obtain a special plate, the government requires a vehicle owner to pay a fee in excess of that required to obtain an ordinary Virginia license plate. It would be incongruous to term the government's providing the option of obtaining these plates, for an extra fee, a subsidy like that provided in *Rust*.

content of special plates in Virginia, the record reveals that little, if any, control ordinarily is exercised. The Commissioner argues that his statutory discretion to approve or reject a given plate design demonstrates that the Commonwealth maintains control at all times over the content of the special plates in question. *See, e.g.,* Va.Code Ann. § 46.2–725(B)(3) (Michie 1998) (stating that "[a]ll special license plates issued pursuant to this article shall be of designs prescribed by the Commissioner...."). The Commissioner, however, has identified only one occasion on which this discretion was exercised, an instance in which the Commissioner rejected a plate design with the slogan "Union Yes." (Br. of Appellant at 45.) The rejection was not challenged. Moreover, the information provided by the Commissioner, acting through a representative at the DMV, to sponsors of special plates suggests that it is they, not the Commissioner, who make the substantive decisions regarding special plate content. The form letter to special plate sponsors, for instance, states that the sponsor is to "provide DMV with electronic media art of the logo and legend for the plate." (J.A. at 104.) Similarly, the "Special Plate Design Criteria" sent to plate sponsors contains detailed instructions for ensuring that the design submitted by the sponsor will conform to size and space requirements, but it does not contain guidelines regarding the substantive content of the plates or any indication of reasons, other than failure to comply with size and space restrictions, that a special plate design might be rejected. *Cf. Wells,* 257 F.3d at 1142 (finding government speech in part because there was "no indication that any of the [private speakers] ... even knew about the ... sign, much less exercised any editori-

al control over its design or content"). Nor does the General Assembly ordinarily assert "editorial control" over the content of these special plates. Indeed, the Commissioner conceded at oral argument that the legislation authorizing the SCV's special plate is the only legislation that the General Assembly has passed containing a restriction on the design of the plate.

### 3.

■ We next inquire into who is the "literal speaker" and who bears the "ultimate responsibility" for the speech in this case. The "literal" speaker here might be said to be the license plate itself, which would seem not to suggest either government or private speech strongly, and who bears "ultimate responsibility" for the speech is unclear. We note that the court in *Wells* reasoned that ownership of the means of communication was a valid consideration in determining whether it contained government speech, and the parties do not dispute here that Virginia continues to own the special plates at all times. Importantly, though, the special plates are mounted on vehicles owned by private persons, and the Supreme Court has indicated that license plates, even when owned by the government, implicate private speech interests because of the connection of any message on the plate to the driver or owner of the vehicle. *See Wooley v. Maynard,* 430 U.S. 705, 717, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977) (holding that New Hampshire violated the First Amendment rights of objecting drivers when it required them to display the state motto "Live Free or Die" on their license plates). Accordingly, these factors, like the others we have discussed, lead us to conclude that the SCV's special plates constitute private speech.[9]

**9.** We note that our conclusion is consistent with the analysis employed by the Second and

## IV.

 Because the speech on the authorized special plate is the SCV's rather than Virginia's, the SCV's First Amendment rights are implicated by the logo restriction in the authorizing legislation, and we must consider the impact of that restriction on their rights. The SCV contend, and the district court found, that the logo restriction discriminates on the basis of the viewpoint they would like to express, through the logo incorporating the Confederate flag, on their special plate. Where the government is not expressing its own policy, either directly or, as in *Rust,* through an intermediary, it presumptively violates the First Amendment when it discriminates on the basis of views expressed by private speakers. *See Ark. Educ. Television Comm'n v. Forbes,* 523 U.S. 666, 677, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998); *Cornelius v. NAACP Legal Defense & Educational Fund,* 473 U.S. 788, 805, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). As the Supreme Court has stated, "[i]t is

axiomatic that the government may not regulate speech based on . . . the message it conveys." *Rosenberger,* 515 U.S. at 828, 115 S.Ct. 2510. Such viewpoint discrimination presumptively is impermissible whether it occurs within or outside a private speech forum. *Forbes,* 523 U.S. at 676, 118 S.Ct. 1633 (stating that viewpoint discrimination is impermissible even where no forum is created at all); *Rosenberger,* 515 U.S. at 828, 115 S.Ct. 2510 (stating that viewpoint discrimination is presumed impermissible in any forum under forum analysis); *Multimedia Pub. v. Greenville–Spartanburg Airport,* 991 F.2d 154, 159 (4th Cir.1993) (same).

### A.

 The Supreme Court has adopted forum analysis as the means of analyzing restrictions placed on private speech that occurs on government property or with government participation (financial or otherwise) where the government is not expressing its own message.[10] *See,*

Eighth Circuits in cases arising in the similar context of vanity plate programs that allow individuals to select specific combinations of letters and numbers that will appear on their otherwise standard license plates. *See Perry v. McDonald,* 280 F.3d 159, 166 (2d Cir.2001) (analyzing a restriction on vanity plates that might be "offensive or confusing to the general public" as a "government regulation[ ] concerning *private individuals' speech* on government-owned property" (emphasis added)); *Lewis,* 253 F.3d at 1079 (analyzing a restriction prohibiting vanity plates that were "contrary to public policy" as a restriction on private individuals' speech).

**10.** The Supreme Court's forum doctrine generally recognizes three categories of fora that exist or arise on government property or where government expends resources and creates them. Traditional public fora include streets, parks, and sidewalks—places which, "by long tradition or by government fiat" have been "devoted to assembly and debate." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 103 S.Ct. 948, 74

L.Ed.2d 794 (1983). These traditional public fora exist regardless of the government's intent to create or not to create a forum for speech. *Forbes,* 523 U.S. at 678, 118 S.Ct. 1633. The other forum types, the designated public forum and the nonpublic forum, are created when the government grants access to property or resources to private speakers. *Id.* at 679, 118 S.Ct. 1633 (holding that the government creates a speech forum when it makes access to government property or funding available to a "certain class of speakers"). A designated public forum, whether limited or unlimited in scope, is one a state creates "by intentionally opening a non-traditional forum for public discourse." *Cornelius,* 473 U.S. at 802, 105 S.Ct. 3439. Further, the government may "confin[e] a [limited] forum to the limited and legitimate purposes for which it was created . . . [by] reserving it for certain groups or for the discussion of certain topics." *Rosenberger,* 515 U.S. at 829, 115 S.Ct. 2510. In a nonpublic forum, the government "reserve[s] eligibility for access to the forum to a particular class of speakers,

*e.g., Rosenberger,* 515 U.S. at 829–30, 115 S.Ct. 2510 (applying forum analysis where government funds private speech, even in a "metaphysical" forum); *Good News Club v. Milford Cent. Sch.,* 533 U.S. 98, 121 S.Ct. 2093, 2100, 150 L.Ed.2d 151 (2001) (applying forum analysis where speech occurs on government property); *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.,* 508 U.S. 384, 390–91, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993) (same); *see also Warren v. Fairfax County,* 196 F.3d 186, 190 (4th Cir.1999) (en banc) ("courts should evaluate First Amendment rights on government owned property under a public forum analysis"). The district court, applying forum analysis principles, concluded that the special plate program constituted a designated or limited public forum. The Commissioner challenges this conclusion, arguing that the special plate program is a nonpublic forum. The type of forum that exists here, however, is relevant only if the logo restriction is viewpoint-neutral. As we discuss below, we conclude that the logo restriction is not viewpoint-neutral, rendering the restriction presumptively unconstitutional in any forum. *Rosenberger,* 515 U.S. at 829–30, 115 S.Ct. 2510 (stating that viewpoint discrimination is presumptively impermissible in all fora for private speech). Thus, we need not resolve the parties' dispute over the type of forum created by the special plate program. Instead, we next explain why the Commissioner's argument that the logo restriction is viewpoint-neutral must fail.

## B.

In examining the Commissioner's argument that the logo restriction is viewpoint-neutral, we begin with the language of the restriction. The logo restriction directs that "[n]o logo or emblem of any description shall be displayed or incorporated into the design of the [SCV] license plates issued under this section." Va.Code Ann. § 46.2–746.22. Although the logo restriction itself makes no reference to the Confederate flag, the Commissioner concedes that it was the inclusion of the Confederate flag in the SCV's logo that led to the prohibition against the use of the logo on the SCV's special license plate. (Br. of Appellant at 10 (conceding that the purpose of the logo restriction is to "ensure that the battle flag does not appear on the special license plate").) Having conceded that the logo restriction is an attempt to ban the display of the Confederate flag, the Commissioner argues that the restriction is content-based, but viewpoint-neutral, because it bans all viewpoints about the Confederate flag (which the Commissioner identifies as a category of "content" or subject matter) from the special plate forum.

 As the Supreme Court has noted, the distinction between content and viewpoint discrimination "is not a precise one." *Rosenberger,* 515 U.S. at 831, 115 S.Ct. 2510. Viewpoint discrimination is a kind of content discrimination, but is not always easily distinguishable.[11] *Cf. id.* at 829, 115

---

whose members must then, as individuals, 'obtain permission' ... to use it." *Forbes,* 523 U.S. at 679, 118 S.Ct. 1633. While the limitations on the government's ability to regulate speech in these fora depends in part on the type of forum at issue, viewpoint discrimination is presumptively impermissible in all fora for private speech. *Rosenberger,* 515 U.S. at 829–30, 115 S.Ct. 2510.

**11.** As the Ninth Circuit has noted, the "coherence of the distinction between 'content discrimination' and 'viewpoint discrimination'" may be seen as "tenuous." *Giebel v. Sylvester,* 244 F.3d 1182, 1188 n. 10 (9th Cir.2001). "While the former describes the subject matter of the speech, and the latter the specific positions taken on the matter, the level at which 'subject matter' is defined can control

S.Ct. 2510 ("When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant. Viewpoint discrimination is thus an egregious form of content discrimination."). Analysis of the basic First Amendment principles that "provide the framework forbidding the state to exercise viewpoint discrimination," however, directs us to the considerations that indicate such viewpoint-based discrimination here. *Id.* at 829, 115 S.Ct. 2510 (reviewing First Amendment cases stating basic principles following from the precept that government may not regulate speech based on its viewpoint or the message it conveys). For instance, "[i]n the realm of private speech or expression, government regulation may not favor one speaker over another." *Id.* at 828, 115 S.Ct. 2510. Similarly, "[t]he government must abstain from regulating speech when the motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id.* (citing *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 46, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983)). Thus, where an evaluation of a given restriction and the surrounding circumstances indicates that one or more speakers are favored over others, and further that the basis for the restriction is in fact the message the disfavored speaker seeks to convey, the restriction violates the First Amendment. Moreover, where restrictions or regulations of speech discriminate on the basis of the content of speech, there is an "inherent risk that the Government seeks not to advance a legitimate regulatory goal, but

to suppress unpopular ideas or information or manipulate the public debate through coercion rather than persuasion ..."—in other words, to exercise viewpoint discrimination. *Turner Broadcasting Sys., Inc. v. F.C.C.,* 512 U.S. 622, 642–43, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994). Because the logo restriction, admittedly aimed at prohibiting the display of the Confederate flag, involves an inherent danger of viewpoint discrimination, a close review of the context in which the restriction is imposed, as well as the effect of the restriction itself, is appropriate.

In analyzing the logo restriction's effect, we note first that the SCV's organizational logo, incorporating the Confederate flag, certainly represents a viewpoint. As the Commissioner concedes, the logo would "advance [the] view that the flag [is] a symbolic acknowledgment of pride in Southern heritage and ideals of independence." [12] (Br. of Appellant at 40 (quotation and citation omitted)); *see also American Legion Post 7 of Durham, N.C. v. Durham,* 239 F.3d 601, 606 (4th Cir.2001) (noting that "[f]lags, especially flags of a political sort, enjoy an honored position in the First Amendment hierarchy" because they are "close[ ] to the core of political expression protected by the First Amendment"). The logo restriction does not restrict the Confederate flag as such, but rather the Confederate flag *as used in the SCV's logo.* Va.Code Ann. § 46.2–746.22 ("no logo or emblem of any description shall be displayed or incorporated into the design of" SCV's special plates). Rather than prohibiting the Confederate flag as subject matter, then, the logo restriction

---

whether discrimination is held to be on the basis of content or viewpoint." *Id.* Nevertheless, it is clear from the Supreme Court's decisions that, given a properly defined subject matter, the government is presumptively unable to discriminate among viewpoints about that subject matter.

**12.** A competing viewpoint of the Confederate flag is that it is "a symbol of racial separation and oppression." *United States v. Blanding,* 250 F.3d 858, 860 (4th Cir.2001).

by its terms prohibits the SCV's use of the Confederate flag. In other words, the logo restriction not only prohibits speech on the basis of its content, as the Commissioner concedes, but also, by its terms, burdens the speech of only a single speaker in the forum. *Cf. Arkansas Writers' Project, Inc. v. Ragland,* 481 U.S. 221, 227–29, 107 S.Ct. 1722, 95 L.Ed.2d 209 (1987) (holding, where a sales tax was theoretically imposed on all magazines, but exemptions from the tax were created for all but a few, that the tax scheme "treat[ed] some magazines less favorably than others," and that the discriminatory impact of the tax on the few magazines subject to it "burden[ed] rights protected by the First Amendment"); *cf. also Giebel v. Sylvester,* 244 F.3d 1182, 1188 (9th Cir. 2001) (concluding that the actions of a professor at a state university in tearing down handbills posted on university bulletin boards publicizing a former colleague's appearance at an upcoming conference were viewpoint-discriminatory because the professor "sought to silence speech by a particular speaker"). This fact alone suggests that the SCV's viewpoint, rather than the Confederate flag as "content," is the subject of the restriction, and thus that the SCV's speech is discriminated against because of the views it would express.

To examine the context in which the logo restriction is imposed, we first define the scope of the forum in which the SCV wish to speak, as definition of the forum's scope provides a backdrop for analysis of the "viewpoint or content" question. *Cf. Rosenberger,* 515 U.S. at 830–31, 115 S.Ct. 2510 (determining that "the subjects discussed [by the prohibited speech] were ... within the approved category of publications" aside from their prohibited perspective by reference to other speech permitted in the forum); *Lamb's Chapel,* 508 U.S. at 393, 113 S.Ct. 2141 (examining a restriction on religious uses of school facilities for viewpoint discrimination by reference to other speech permitted within the forum). This inquiry is distinct from the question of which type of forum exists. *See Cornelius,* 473 U.S. at 797, 800–01, 105 S.Ct. 3439 (noting that proper definition of the scope of the relevant forum is necessary to analyze constitutionality of a restriction); *Air Line Pilots Ass'n, Int'l v. Dept. of Aviation of Chicago,* 45 F.3d 1144, 1151 (7th Cir.1995) (stating that identification of forum must be undertaken before analysis of a restriction imposed on speech in that forum).

The relevant forum is defined by focusing on "the access sought by the speaker." *Cornelius,* 473 U.S. at 801, 105 S.Ct. 3439. Here, the relevant forum is Virginia's special plate program, consisting of the special plates authorized and produced under the general rules established by Va.Code Ann. § 46.2–725. It is to the special plate program that the SCV seek "access" (here, access without restrictions on their speech within the forum), and special plates authorized for other groups and organizations thus provide the relevant context for analyzing the restriction imposed on the SCV. *Cf. Air Line Pilots,* 45 F.3d at 1151–52 (determining, where an airline pilots' association sought to display a diorama in display case at O'Hare airport, that the airport's display cases, rather than the airport itself, constituted the relevant forum, because it was to a display case that association sought access); *Texas v. Knights of the Ku Klux Klan,* 58 F.3d 1075, 1078 (5th Cir.1995) (defining the forum in question, where the Ku Klux Klan sought to participate in an Adopt–A–Highway Program, as the program as a whole rather than the State's highways or the particular sign to which participation would entitle the Klan).

That the Confederate flag as content is prohibited in this forum, as the Commissioner contends, is not borne out by the

statute at issue, the record before us, or any rules or restrictions generally applicable to Virginia's special plate program. No general restrictions, save those relating to space and legibility of identifying information, are imposed on all special plates. The logo restriction is the only restriction of its kind contained in any of the numerous special-plate-authorizing statutes. A review of these numerous and varied statutes does not reveal any intent on the Commonwealth's part to limit, on the basis of content, the scope of speech within the special plate forum in any principled way. Further, the "content" of the excluded speech is similar, if not identical, to content allowed on plates authorized under the special plate program for those with other viewpoints. For example, many of the groups and organizations for which special plates have been approved without restrictions are groups that have distinct viewpoints in political or social debate. *See, e.g.,* Va.Code Ann. § 46.2–746.10 (approving special plate for AFL–CIO supporters without restriction); § 46.2–749.6 (approving special plate for supporters of the National Rifle Association without restriction).

■ The nature of the restricted speech, the lack of a generally applicable content-based restriction,[13] the breadth of

the special plate program in Virginia, and the lack of any restrictions in statutes authorizing special plates other than the SCV's belie the Commissioner's argument that the restriction in question is merely a content-based restriction. Rather, the logo restriction works viewpoint discrimination against the SCV. Such discrimination, as we have noted, is "presumed to be unconstitutional." *Rosenberger*, 515 U.S. at 828, 115 S.Ct. 2510. The Commissioner has not rebutted—indeed, has not contended that he could rebut—the presumption of unconstitutionality following from viewpoint discrimination against private speech by demonstrating that the viewpoint discrimination is "the least restrictive means available" to serve a "compelling governmental interest[ ]." *American Life League, Inc. v. Reno,* 47 F.3d 642, 648 (4th Cir. 1995). Thus, the logo restriction cannot withstand strict scrutiny review.

Based upon our review of the government speech and forum principles enunciated by the Supreme Court, and application of those principles to the case at hand, we conclude that the logo restriction in Va.Code Ann. § 46.2–746.22 is an instance of viewpoint discrimination that does not survive strict scrutiny review and accordingly is impermissible.[14] The restriction,

**13.** We note that we are not faced with a restriction generally applicable to the design of special plates in Virginia. Thus, this case differs from the vanity plate cases decided by the Second and Eighth Circuits. *See Perry v. McDonald,* 280 F.3d 159, 169–70 (2d Cir. 2001) (upholding the application of a vanity license plate regulation banning plates conveying messages "offensive or confusing to the general public" to rescind license plates bearing the letters "SHTHPNS" because the regulation was a reasonable, viewpoint-neutral restriction on speech in a nonpublic forum); *Lewis v. Wilson,* 253 F.3d 1077, 1080–81 (8th Cir.2001) (finding unconstitutional a regulation banning vanity plates bearing messages "contrary to public policy" because the regulation gave unbridled discretion to the

state official charged with enforcing it), *cert. denied, Fischer v. Lewis,* —— U.S. ——, 122 S.Ct. 1536, 152 L.Ed.2d 464 (2002). We, therefore, need not resolve whether such a generally applicable restriction or regulation would pass constitutional muster if applied to ban incorporation of the SCV's logo into their special plate design.

**14.** Accordingly, we need not address the adequacy of the Commissioner's proffered justifications under the standard applicable to content-based but viewpoint-neutral restrictions in fora for private speech. Further, the Commissioner has not advanced the argument that display of the Confederate flag on a private vehicle is equivalent to "fighting words,"

then, cannot stand. The proper remedy for this violation of the First Amendment's strictures, however, remains to be determined, and it is to that issue that we now turn.

### V.

■■■ Because we agree with the district court that the logo restriction is unconstitutional, we must determine whether the district court properly severed the statute. The Commissioner argues that severing the statute was an improper incursion into the realm of legislative discretion. Moreover, if the statute was not severable, the Commissioner claims, there was no legal basis for the district court's asserted exercise of its "equitable power" and hence that portion of the district court's ruling that compels the Commissioner's compliance with the non-restrictive portion of section 46.2–746.22 must likewise be invalidated. The question of the severability of a state statute's provisions is governed by state law. *See Department of Treasury v. Fabe*, 508 U.S. 491, 509–10, 113 S.Ct. 2202, 124 L.Ed.2d 449 (1993) (state law governs severability of a state statute); *Environmental Technology Council v. Sierra Club*, 98 F.3d 774, 788 n. 21 (4th Cir.1996) (same). We review the district court's determination of severability de novo.

The Virginia Supreme Court has enunciated the test for severability under Virginia law only in the absence of a blanket severability clause, applying a presumption of nonseverability. *Robinson v. Virginia*, 217 Va. 684, 232 S.E.2d 742, 744 (1977) (noting that where an ordinance "contained no severability clause ... [,] the ordinance [was] presumed to be non-sever-

able"). Under this rule, "in the absence of a severability clause, the test of severability is whether the legislature would be satisfied with what remains [of the statute] after the invalid part has been eliminated," an inquiry that makes the intent of the law-makers controlling. *City of Portsmouth v. Citizens Trust Company*, 216 Va. 695, 222 S.E.2d 532, 535 (1976) (internal quotation marks omitted). Stated slightly differently, the inquiry enunciated by Virginia's highest court is whether the General Assembly has "manifested an intention to deal with part of the subject matter covered, irrespective of the rest of the subject matter[.]" *Robinson*, 232 S.E.2d at 744 (1977) (internal quotation marks omitted).

Since the decisions noted above, Virginia's General Assembly has enacted a statutory provision dealing with severability of sections of the Virginia Code. Section 1–17.1 of the Code provides that "the provisions of *all* statutes are severable unless ... it is apparent that two or more statutes or provisions *must* operate in accord with one another." Va.Code Ann. § 1–17.1 (Michie 2001) (emphases added). In other words, the Virginia legislature has stated clearly that courts are now to apply a presumption of severability unless two provisions of a statutory section *must* operate together.

We have had occasion to apply section 1–17.1 only once. In *Jones v. Murray*, 962 F.2d 302 (4th Cir.1992), we concluded that a portion of a Virginia statute was severable, citing section 1–17.1 and the pre-section 1–17.1 case of *City of Portsmouth v. Citizens Trust Co.*, 216 Va. 695, 222 S.E.2d 532 (1976). *Jones*, 962 F.2d at 311. We noted that in *City of Portsmouth* the Virgi-

the use of which the Commonwealth constitutionally may prohibit, and we do not address any issues that might be raised by such an argument. *See Chaplinsky v. New Hampshire*, 315 U.S. 568, 572, 62 S.Ct. 766, 86 L.Ed. 1031 (1942) (characterizing as "fighting words" speech that "itself inflicts injury or tends to incite immediate violence").

nia Supreme Court had "sever[ed][an] unconstitutional mandate, even without a severability clause, because '[d]eletion of the invalid [provision did] not alter the effect of the ordinance in fulfilling the purpose expressed'." *Jones,* 962 F.2d at 311 (alterations in original) (quoting *City of Portsmouth,* 222 S.E.2d at 535). We went on to note our opinion that "the legislature would be satisfied with what remains after the invalid part has been eliminated." *Id.* (citing *City of Waynesboro v. Keiser,* 213 Va. 229, 191 S.E.2d 196, 200 (1972)) (internal quotation marks omitted).

The parties' arguments evidence considerable confusion about the proper standard for determining severability of statutory provisions under Virginia law. The Commissioner contends, citing to the district court's opinion below, that "the test of severability in the Commonwealth is whether the *legislature* would be satisfied with what remains after the invalid part has been eliminated." (Br. of Appellant at 51) (internal citation omitted). The district court determined that the quoted language was the proper test for severability, but that it is "buttressed by the modern-day Virginia Code, which requires that the severed and remaining portions 'must operate in accord with one another'." *Sons of Confederate Veterans v. Holcomb,* 129 F.Supp.2d 941, 949 (W.D.Va.2001). The SCV appear to concede that the intent of the legislature is the proper standard for determining severability. Indeed, the SCV do not even cite to section 1–17.1 in their brief.

■■■ Examining the statutory framework and relevant caselaw, we conclude that section 1–17.1 is the governing statement of the law of severability in Virginia. Accordingly, we apply the statute's presumption of severability to section 46.2–746.22's provisions. The provisions are thus "severable unless ... it is appar-

ent that ... [the] provisions must operate in accord with one another." Va.Code Ann. § 1–17.1. We see no reason why the second sentence of § 46.2–746.22 *must* operate in accord with the first, and the Commissioner has not suggested any such reason in his brief. The first sentence is not rendered meaningless or nonsensical by the elimination of the second. Indeed, the operation of the first sentence is in a sense not affected at all by the elimination of the second—it continues to authorize special plates for the SCV, as it did before the second sentence was determined to be unconstitutional. The only change in the statute's operation is the excision of the unconstitutional logo restriction, a restriction that was imposed entirely by the second sentence. *Cf. Jones,* 962 F.2d at 311 (invalidating and severing five words of Virginia statute that violated the Ex Post Facto Clause because severance did not alter the effect of the statute in fulfilling its primary purpose).

Even assuming, as the parties apparently do, that the "intent of the legislature" inquiry remains a valid consideration in determining severability under Virginia law, we find that it is overcome here by the presumption of severability which applies to statutes enacted by the General Assembly. The logo restriction may well have been the result of a political compromise within the legislature that aided the passage of section 46.2–746.22. Some legislators may have agreed to support the authorizing statute only on condition of the addition of the logo restriction. Under the current legal framework in Virginia, however, the General Assembly enacts laws against the backdrop of section 1–17.1's severability presumption. Without a clear indication that the legislature's intent was to enact section 46.2–746.22 only with the logo restriction in place, and without any expression of the statute's purpose, we cannot presume that the legislature would

not be "satisfied" with what remains after the second sentence is severed. In sum, our review of the severability issue here convinces us that the result reached by the district court was the correct one.[15]

## VI.

For the foregoing reasons, we conclude that the district court properly held that the logo restriction in Va.Code Ann. § 46.2–746.22's second sentence violates the First Amendment. We also conclude that the second sentence of section 46.2–746.22 may be severed from the remainder of the statute. The judgment of the district court is accordingly affirmed.

*AFFIRMED.*

---

**15.** After finding that the logo restriction could be severed, the district court stated that if it could not be severed, the court "would exercise equitable power in enjoining the [Commissioner] from enforcing [the logo restriction] and requiring the issuance of plates displaying the [SCV's] logo." The Commissioner contends that such an exercise of equitable power would be outside the realm of the court's discretion. Because the district court properly severed the statute, we do not address the injunctive relief that it stated it would, in the alternative, provide.