**T.J. DOHERTY, Plaintiff,**

v.

**Jo Anne B. BARNHART,[1] Commissioner of the Social Security Administration, Defendant.**

**Civ.A. No. H–01–1550.**

United States District Court,
S.D. Texas,
Houston Division.

March 3, 2003.

---

1. Jo Anne B. Barnhart was appointed Commissioner of the Social Security Administration effective November 9, 2001 and, accordingly, is named as the Defendant in this matter.

T.J. Doherty, Houston, TX, for plaintiff.

Kim Elizabeth Garcia, Social Security Administration, Office of the General Counsel, Dallas, TX, for defendant.

### MEMORANDUM AND ORDER

ATLAS, District Judge.

No objections to the Memorandum and Recommendations of Magistrate Judge Calvin Botley [Doc. # 16] have been filed. The Court accordingly concludes that the Memorandum and Recommendations should be adopted. It is therefore

**ORDERED** that the Memorandum and Recommendations [Doc. # 16] are adopted as this Court's Memorandum and Order. It is further

**ORDERED** that the Commissioner's Motion for Summary Judgment [Doc. # 11] is **GRANTED**. It is further

**ORDERED** that this matter is **DISMISSED with prejudice** from the Court's docket.

## MEMORANDUM AND RECOMMENDATIONS

Plaintiff T.J. Doherty ("Doherty") seeks judicial review of the Social Security Administration's ("SSA") denial of his claims for disability benefits provided by Title II of the Social Security Act, 42 U.S.C. §§ 405, *et seq. See* Plaintiff's Complaint (Entry # 1). Defendant Jo Anne B. Barnhart, Commissioner of the Social Security Administration ("Commissioner"), urges the decision denying Doherty's claim for benefits be upheld and maintains the claimant is not disabled as he is able to perform sedentary work in a low stress work environment doing simple repetitive tasks, such jobs found to exist in significant numbers in the national economy. *See* Defendant's Motion for Summary Judgment (Entry # 11) and Memorandum in Support of Motion for Summary Judgment (Entry # 12).[2] Doherty, a *pro se* litigant, failed to respond to the Defendant's Motion for Summary Judgment (Entry # 11), however, it is assumed that Doherty contends that the administrative law judge ("ALJ") wrongfully determined that he is not disabled as a consequence of failing to properly consider his physical and mental impairments. *See* Plaintiff's Complaint (Entry # 1).[3] Doherty maintains that the Commissioner's decision should be reversed or remanded, contend-ing that it is not premised upon substantial evidence and does not comply with applicable legal standards. Conversely, the Commissioner contends that the finding that Doherty is not disabled, is based upon a complete review of the claimant's medical records as well as the opinions of treating physicians and of the vocational and consulting medical experts and, accordingly, the Commissioner's reaffirmation of the ALJ's decision that Doherty is not disabled, as he retains the residual functional capacity to perform sedentary work in a low stress work environment doing simple repetitive tasks, is based upon substantial evidence and a proper application of the relevant legal standards. *See* Defendant's Motion for Summary Judgment (Entry # 11). The Commissioner disputes Doherty's claims and contends that affirming the denial of the claim for disability and supplemental security income benefits is the only proper conclusion to this matter.

For the reasons discussed below, it is recommended that the ALJ's findings be affirmed.

## THE EVIDENTIARY RECORD

### A. Age, Education & Work Experience

Thomas Joseph (T.J.) Doherty is a forty three (43) year old, married male with no minor children. Doherty has a high school education and completed two years of college while attending the University of Houston as a sociology major and, has past work experience as a manager and vice-president of an advertising company, estimator and as president of his own con-

---

2. Defendant's Motion for Summary Judgment (Entry # 11) and Memorandum in Support (Entry # 12) will be referred to as Defendant's Motion for Summary Judgment (Entry # 11).

3. *See also* Request for Review of Hearing Decision/Order (R. 9). It should also be noted that following the filing of his Complaint, Doherty requested appointment of counsel on his behalf, however, the request was denied due to his ability to financially engage his own attorney. Doherty then failed to file a response to the Commissioner's Motion for Summary Judgment (Entry # 11) despite being ordered to do so. *See* Order (Entry # 14).

struction firm. (T. 40–41; R. 20–21, 103–119, 201, 277).[4] Doherty ceased working July 15, 1996, as a consequence of his alcoholism allegedly resulting in cirrhosis of the liver with esophageal varices, gastritis and depression; although, he returned to work with the construction company, assuming fewer and lower responsibilities, on May 20, 1999. (R. 14–22, 136–143; T. 45–46, 53–55).

## B. The Medical Evidence

The medical records reflect that in May of 1992, oral surgeon, Dr. Douglas D. Carver, performed oral surgery on Doherty. (R. 342–346).

On February 4, 1994, Dr. Carver extracted one of Doherty's teeth at the request of dentist, Dr. Robert Maneen. Dr. Carver indicated that the procedure went well. (R. 341, 347). Doherty was under the care of Dr. Julius DeBroeck, Jr., who after performing a general physical examination, prescribed Xanax for Doherty's complaint of alcohol abuse. (R. 369–373).

On May 31, 1995, Doherty was seen by gastroenterologist, Dr. Ira Flax of Gastroenterology Consultants, for acute alcoholism and a request for alcohol rehabilitation. Dr. Flax noted that, on occasion, Doherty was taking Librium. On October 25, 1995, Dr. DeBroeck indicated in a written note that Doherty had experienced the long illness and eventual death of his father, as well as the deaths of other close family members during the preceding two years. (R. 328, 374).

On July 30, 1996, Doherty was admitted into Charter Behavioral Health System of Kingwood by Dr. Alan Lloyd for alcohol dependence and possible moderate depressive disorder. Doherty indicated he had been drinking one-fifth of Vodka per day for the previous fifteen years. He related that he had been diagnosed with hepatitis the prior year and that he had a history of coronary artery disease. Doherty was admitted to the adult chemical dependency unit and was given Librium for alcohol withdrawal. A physical examination performed by Dr. Barry Willens of Charter Hospital revealed no abnormal results, including the heart, which was normal and without murmur. Dr. Joyce Liegel performed a psychiatric assessment in which she determined that Doherty had positive vegetative signs but was oriented to person, place and time, with an intact memory and recall. He had intellectual functioning at the above average level with decreased insight and judgment. Dr. Liegel diagnosed Doherty with having an impaired occupational, social family and economic function due to his alcohol dependence and withdrawal. Doherty was discharged on August 3, 1996, following detoxification, with instructions to continue with Alcoholics Anonymous (AA) meetings and taking medications of Librium, Dalmane, Iberet and Paxil. On October 4, 1996, Doherty was admitted into Memorial Hospital by Dr. Ira Flax, after being seen in the emergency room with the complaint that he was coughing blood. An examination by Dr. Ira L. Flax revealed that Doherty smelled of alcohol and had a swollen abdomen with massive hepatomegaly which was mildly tender, had trace ascites and revealed a blackened stool after taking Pepto Bismol. Doherty was admitted into the hospital into intensive care and underwent an endoscopy revealing small non-bleeding varices and a small Mallory–Weiss tear. Scans of Doherty's abdomen performed on October 4, 1996, demonstrated minimal intestinal gas with no evidence of ileus or

---

**4.** References made to statements taken from that portion of the administrative record identified as the "transcript" of the administrative hearing are designated "T," followed by the applicable page number(s) of the record; and, references made to items contained in the remainder of the record are designated "R," followed by the applicable page number(s).

mechanical obstruction and no evidence of gross organomegaly or significant calcification. Chest x-rays revealed that the heart, lungs, mediastinum and bony elements were within normal limits. Doherty underwent a panendoscopy performed by Dr. Flax for possible massive upper gastrointestinal ("GI") bleed. During the procedure a small healing Mallory–Weiss tear was seen on the posterior wall of the lesser curvature innerface. The impression was that Doherty had an upper GI bleed secondary to a Mallory–Weiss tear with early, fully effaceable small esophageal varices, possibly related to alcohol. Following rebleeding, endoscopies were again performed on October 6 and 7, 1996, revealing smaller varices and although the tear was no longer seen, proximal gastritis was identified. On October 8, 1996, Dr. Eileen K. Starbranch of Memorial Hospital, examined Doherty at the request of Dr. Flax and determined that he was complaining of "spitting up blood." Doherty indicated that he drank 8–12 oz. of Vodka mixed with Seven–Up daily for more than twenty years, although he quit drinking fourteen years prior for a two month period. Doherty admitted that was an alcoholic and indicated that he has unresolved grief issues as a result of the death of his father. Doherty indicated that he was hospitalized in Chicago for ten days for treatment of alcoholism, fourteen years earlier and that following a subsequent hospitalization at Charter Hospital in Kingwood, Texas, he was sober for three days. Doherty denied any previous surgical or psychiatric treatment and indicated he was currently taking Nitro–Dur, Librium, Prilosec, Aldactone and Paxil. He was taking Paxil and Librium to relieve anxiety. He had no allergies but admitted he smoked a pack of cigarettes per day and indicated he attended AA meetings every couple of weeks. Doherty indicated that a paternal uncle and two brothers may be alcoholics, but he denied any binging, purging, suicidal or homicidal ideation on his part. Dr. Starbranch determined that Doherty's intellectual function was in the average range, he was oriented in all spheres and had a good general fund of information. The physician assessed his insight and judgment as poor with increased impulsivity. Dr. Starbranch recommended that Doherty undergo day treatment on an outpatient basis at Spring Shadows Glen and to cease taking any antidepressant because his liver was so compromised. Doherty was discharged from the hospital on October 9, 1996, with a diagnosis of alcohol hepatitis without cirrhosis and upper gastrointestinal bleed secondary to a Mallory–Weiss tear, prescriptions for Aldactone and Prilosec and instructions to discontinue drinking. On October 28, 1996, Doherty reappeared before Dr. Flax with complaints that he had lost twelve pounds within twelve days, despite drinking generous amounts of liquids, including water, Coca Cola and milk. Doherty's earlier complaints of swelling in the feet subsided, however, he believed that his stomach was swollen and he complained of nausea. A physical examination revealed that he was a well developed and nourished male with a less pseudo-Cushingoid appearance. He had a slight tachycardia and a massively enlarged, mildly tender liver with slightly bulging flanks and a fluid wave. The ascites were diminished but clearly present. Dr. Flax's diagnosis was alcoholic hepatitis and it was recommended that he undergo a Sequential Multi–Channel Analysis with Computer ("SMAC") profile and CBC (complete blood count). Doherty was admitted into Memorial Hospital by Dr. Flax on December 13, 1996, with decreased weight (185 lbs from 200 lbs), an enlarged liver with ascites and a temperature of 101 degrees. Doherty was complaining of an increasing abdominal girth despite weight loss and distended abdomen. He was admitted into the hospital with a diagnosis of a diffuse

coarse liver without focal lesions and possible cirrhosis of the liver with superimposed alcoholic hepatitis. On December 25, 1996, Doherty underwent an abdominal sonogram interpreted by radiologist, Dr. Hsiao Yang Chin, that revealed the liver as diffusely coarse and slightly enlarged with no evidence of focal lesion. The gallbladder was physiologically distended with a moderate amount of sludge. Moderate amounts of ascites were seen around the liver and within the hepatorenal pouch. Scans of the kidneys revealed unremarkable results, however, the spleen was homogenous and enlarged. (R. 146–154, 175–214, 321–327).

Doherty reappeared for follow-up examination by Dr. Flax on January 17, 1997. He indicated that on January 8, 1997, he was being treated in the Drug and Rehabilitation Program at West Side Psychiatric Hospital for his alcohol abuse. A physical examination revealed normal results with the exception of an enlarged liver, although Doherty agreed that his stomach was smaller. Dr. Flax's impression was that Doherty had cirrhosis of the liver with portal hypertension and recommended that he undergo esophageal banding. On January 30, 1997, he was admitted into Memorial Hospital after appearing in the emergency room with complaints of an upper gastrointestinal bleed following alcohol intake. Doherty underwent a panendoscopy and esophageal variceal band ligation performed by Dr. Flax to cease the bleeding into the stomach from an esophageal varix. He tolerated the procedure well and it was recommended that he undergo an additional band ligation within three weeks. Doherty was discharged from the hospital with a diagnosis of alcoholic hepatitis, superimposed on cirrhosis of the liver. On February 3 and 7, 1997, Doherty reappeared before Dr. Flax with complaints of abdominal pain. An examination revealed that he had no fever and his abdomen was soft with minimal voluntary

guarding but no rebound or rigidity. There was non-localized tenderness in all four quadrants. Dr. Flax's impression was that he had mild diverticulitis but wished to rule out spontaneous peritonitis. On July 11, 1997, Doherty was admitted by Dr. Eugene Degner into West Oaks Hospital for continued alcohol relapse, with a diagnosis of alcohol dependency and withdrawal syndrome and organic brain syndrome resulting from cirrhosis of the liver with esophageal varices. An examination revealed slight jaundice, with slow speech and mental processes. It was noted that Doherty was not cooperative with treatment, as he missed group sessions or would sleep during lectures. A mental status examination was performed by Dr. Mark Garry revealing no delusions or psychotic disorder and no perceptual disturbances. Doherty was alert and oriented to time, place and person, with average intelligence, and good long term memory. His short term memory and judgment was very poor, with fair reliability and good insight. Doherty was discharged on July 23, 1997, with recommendations to continue with prescriptions for Aldactone and Chronulac and for long-term (120 days) treatment, however, Doherty and his wife were not willing to participate in this type of treatment. Doherty was admitted into Columbia Rosewood Medical Center by Dr. G.K. Ravichandran to treat his alcohol dependency. He underwent detoxification and was then discharged five days later for further treatment at Spring Shadows Glen, with a good prognosis if he continued with treatment. Doherty was admitted into Spring Shadows Glen on August 27, 1997, for alcohol dependency treatment and was discharged October 31, 1997, with a diagnosis of severe alcoholism and cirrhosis of the liver. On September 30, 1997, Dr. Flax examined Doherty at Memorial Spring Shadows Glen, following his admission into the adult chemical dependency

residential unit for detoxification. Dr. Flax noted that during the winter of 1997, Doherty had undergone banding but had no follow up endoscopy to assess the status of his bands. A physical examination revealed normal results, except for an enlarged, mildly tender liver with no masses or ascites. Dr. Flax's diagnosis was cirrhosis of the liver due to chronic alcoholism. On December 4, 1997, Dr. Flax examined Doherty and noted that he had recently been admitted and discharged from Spring Shadows Glen and indicated that he had been sober for several months. An examination demonstrated that the abdomen was soft, with no tenderness or ascites noted in the liver. Dr. Flax recommended that Doherty continue with his alcohol abstinence and undergo another endoscopy to assess the ablation of his varices. (R. 155–174, 215–265, 302–320).

Dr. Ronald Zweighaft ordered MRIs of the brain, following Doherty's admission to Memorial Hospital on February 9, 1998, with complaints of possible cerebral vascular accident. An MRI revealed some cortical atrophy was evident but was otherwise normal. Dr. Daniel H. Spoor, a consultant with the Texas Rehabilitation Commission ("TRC"), diagnosed Doherty as having non-severe impairments related to his alcohol and cirrhosis in remission. Further, Dr. Spoor's review of the medical records indicated that there was a discrepancy as to the source of Doherty's bleed as one report indicated it was due to a single varix, which had been ligated, and another report indicated the bleeding was due to non-varice induced gastritis. Nonetheless, Dr. Spoor indicated that Doherty had recovered well, the ascites had cleared with the return of normal liver function following the successful rubber band ligation in 1997. A Psychiatric Evaluation was completed by Dr. Theron Bowers on July 18, 1998, indicating that Doherty related that he had been sober since August of 1997, when he was diagnosed with depression and given a prescription for Prozac. He reported that his mood was improved, although he had decreased sleep and appetite. Doherty indicated he was more hopeful about the future and believed he was making progress. Doherty further indicated that he suffered a cerebral vascular accident in February of 1998, which had affected his vision. Dr. Bowers' assessment was that Doherty had some depressive symptoms related to a history of alcohol abuse, however, the symptoms appeared to have improved tremendously in concert with Doherty's effort to remain sober. Further, Dr. Bowers indicated that as long as Doherty remained sober, his symptoms would continue to improve. On August 7, 1998, disability examiner, Mildred Acevedo, determined that Doherty was unable to perform his past relevant work but would be able to obtain positions as a drill punch operator, machine cleaner or polisher. Dr. Lyman Phillips completed a Psychiatric Assessment Form and Mental Residual Functioning Capacity Assessment at the request of the TRC on August 13, 1998, in which he concluded that Doherty had an affective disorder related to substance addiction with no limitation as to his daily living activities, slight difficulty in maintaining social function, infrequent episodes of deterioration or decompensation in work or work-like settings, and seldom evinced deficiencies of concentration, persistence or pace that would result in failure to complete tasks in a timely manner. Dr. Phillips noted that Doherty's allegations of depression as attributed to his alcohol dependence, which was in remission, were credible and that he retained the ability to carry out short and simple instructions. Further, Doherty did not have significant limitations as to understanding, memory, concentration, adaptability or persistence; but, was moderately

limited in the ability to interact with co-workers or peers. Doherty appeared in Dr. Flax's office on September 14, 1998, with complaints of multiple abscesses on his right thigh. Doherty indicated that he had abstained from alcohol use for several months and that his wife had taken over his business. An examination revealed an abscess in the medial aspect of the right thigh, which was aspirated of its bloody purulent material, revealing induration and erythema, as well as scarring from surrounding sites of similar inflammation. A general physical examination revealed mild splenomegaly, although the liver was not palpably enlarged. Laboratory work was obtained and Doherty was given a prescription for Keflex for the abscess. Dr. Flax forwarded copies of Doherty's laboratory work-up to Dr. Gerald Bush on September 23, 1998, revealing that his liver enzymes were approaching the normal range and that clinically, Doherty appeared improved with an increased weight gain and better sense of well-being. Dr. Flax related that Doherty was diagnosed with cirrhosis of the liver, which was dormant due to alcohol cessation, but his protime was slightly prolonged despite a normal albumin. On October 12, 1998, oral surgeon, Dr. Sharon Peterson, removed three of Doherty's teeth and he tolerated the procedure well. On October 3, 1998, Dr. Randall S. Rosenberger, completed a Case Assessment Form for the@ TRC, in which he concluded that Doherty had alcoholic cirrhosis but that his allegations exceeded the objective physical findings. (R. 135, 266–301, 329–340, 348–349, 355–358).

On January 21, 1999, Doherty returned to Dr. Flax with complaints of abdominal pain. He indicated that he had two prior episodes within the past month of abdominal bloating and pain. A physical examination revealed that Doherty had no stigmata of chronic liver disease, his blood pressure was 124/70 and he weighed 221 lbs. The examination indicated epigastric tenderness with tenderness in the entire right upper quadrant due to enlargement of the liver. No ascites were noted. Dr. Flax recommended an abdominal ultrasound and obtaining liver enzymes to rule out biliary colic. Laboratory results indicated that Doherty's liver enzymes were normal, however, the ultrasound revealed signs of portal hypertension and gallstones probably due to biliary colic that may necessitate a laparoscopic cholecystectomy. (R. 350–354). An insurance agent notified Doherty on May 19, 1999, that he would be unable to obtain life insurance coverage for him as a consequence of his recent stroke and cirrhosis of the liver. (R. 144). On July 5, 1999, psychologist, J.L. Paterson, completed a Psychological Evaluation for the TRC, in which he assessed Doherty as putting forth a good effort on the tasks administered, spontaneously verbal and able to adequately verbally express himself. Doherty related that although he was taking Prozac, he had no prior mental health treatment and indicated he "was never aware of" his prior episodes of depression. Doherty indicated that he was self-employed in the commercial construction industry and had returned to work, after a two year absence, in May of 1999. Doherty was diagnosed with non-severe depression due to alcohol dependence in full remission. Doherty had a flat effect with no delusions, hallucinations, ideations, compulsions or phobias with normal thought stream and associations. There was no evidence of limitations as to social activity, adaptability, persistence, concentration or pace. (R. 359–367).

## C. The Procedural Background—The Administrative Proceedings and Exhaustion of Administrative Remedies

Doherty filed an application with the Social Security Administration on May 19,

1998, seeking disability benefits for the closed period between July 15, 1996 through May 20, 1999, due to an inability to work as a consequence of his alcoholism which allegedly resulted in cirrhosis of the liver with esophageal varices, gastritis and depression. (R. 94–96; T. 45–46, 53–55). Following an agency denial of the claim for benefits, an administrative hearing was held on August 20, 1999, at which Doherty was represented by an attorney. (T. 35–70). The administrative law judge, on September 22, 1999, denied Doherty's request for benefits after finding that he was disabled between July 15, 1996 and November 4, 1997, but determined that, his alcoholism was a material factor contributing to the disability; and, that following November 4, 1997, Doherty's medical condition had improved, his alcoholism was in remission, and he therefore, was no longer disabled and capable of performing sedentary work in a low stress environment doing simple, repetitive tasks. (R. 14–22). Following Doherty's appeal of the denial of his claim, the Appeals Council affirmed the ALJ's decision on March 16, 2000, thereby, resulting in the ALJ's decision becoming the final decision of the Commissioner. (R. 6–7). Doherty has, therefore, exhausted all administrative remedies prior to seeking judicial review, and accordingly, the Court has the proper authority, conferred statutorily, with which to commence its review.[5] See *Sims v. Apfel*, 530 U.S. 103, 107, 120 S.Ct. 2080, 147 L.Ed.2d 80 (2000); *Weinberger v. Salfi*, 422 U.S. 749, 757, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975); *Jackson v. Apfel*, 234 F.3d 246 (5th Cir. 2000); *McQueen v. Apfel*, 168 F.3d 152, 155 (5th Cir.1999); *see also* 42 U.S.C. § 405(g); 28 U.S.C § 1383(c)(3) and 20 C.F.R. § 404.981 and/or 20 C.F.R. § 416 (1999), *as applicable*.

## STANDARDS OF REVIEW

### The Motion for Summary Judgment

Summary judgment is proper if there is no genuine dispute as to any material fact and the moving party is, therefore, entitled to judgment as a matter of law. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), quoting *Fed.R.Civ.P. 56(c); see also *Colson v. Grohman*, 174 F.3d 498, 506 (5th Cir.1999); *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir.1998); *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir.1993). The moving party bears the burden of showing that there is an absence of evidence to support the nonmovant's case. *Id.* A factual dispute is "genuine" when a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); see also *PYCA Industries, Inc. v. Harrison County Waste Water Management District*, 177 F.3d 351, 361 (5th Cir.1999); *Crowe v. Henry*, 115 F.3d 294, 296 (5th Cir.1997). The substantive law dictates which facts are "material." See *Stewart v. Murphy*, 174 F.3d 530, 533 (5th Cir.), *cert. denied*, 528 U.S. 906, 120 S.Ct. 249, 145 L.Ed.2d 209 (1999); *Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 189 (5th Cir.1991). A fact is material if its resolution could affect the outcome of the matter. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 106 S.Ct. 2505. Facts may be gleaned from reviewing the pleadings, answers to interrogatories, admissions and affidavits on file. See *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994). In deciding whether a fact issue has been created, all justifiable inferences must be viewed in the light most favorable to the nonmoving party and questions of law are reviewed de

**5.** This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. section 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act and Rule 72, Fed.R.Civ.P. *See* Order of Referral (Entry # 5).

novo. See *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *Merritt–Campbell, Inc. v. RxP Prods., Inc.*, 164 F.3d 957, 961 (5th Cir.1999); *Horton v. City of Houston*, 179 F.3d 188, 191 (5th Cir.1999). If the summary judgment motion is properly supported, however, the burden shifts from the movant to the adverse party, who may not rest on mere allegations or denials, but must set forth specific and supported material facts, of significant probative value, establishing that there exists a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *International Association of Machinists and Aerospace Workers v. Compania Mexicana de Aviacion, S.A. de C.V.*, 199 F.3d 796, 798 (5th Cir.2000); *Union Planters National Leasing, Inc. v. Woods*, 687 F.2d 117, 119 (5th Cir.1982). In an instance such as that presented here, however, when the nonmovant presents no contradictory facts supported by proof, the Court must not assume that the facts necessary to defeat summary judgment could or would be proven. See *Burns v. Harris County Bail Bond Board*, 139 F.3d 513, 518 (5th Cir. 1998); see also *Little v. Liquid Air Corp.*, 37 F.3d at 1075.

### The Administrative Determination

■■■ A review of the Commissioner's decision to deny disability benefits compels a determination of whether the substantial evidence in the record, reviewed as a whole, supports the decision, and further, whether proper legal standards were used in evaluating the evidence. *Loza v. Apfel*, 219 F.3d 378, 389 (5th Cir.2000); *Estate of Morris v. Shalala*, 207 F.3d 744, 745 (5th Cir.2000); *Crowley v. Apfel*, 197 F.3d 194, 197 (5th Cir.1999); *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir.1999). "Substantial evidence" means that which is more than a mere *scintilla* but less than a preponderance; and, it is evidence of such relevance

that a reasonable mind would accept it as adequate to support the conclusion reached. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir.1999); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir.1995). The elements of proof to be weighed in determining whether substantial evidence exists, include the (1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) claimant's subjective evidence of pain; (4) claimant's educational background, age and work history. *Owens v. Heckler*, 770 F.2d 1276, 1279 (5th Cir.1985). The Court is not, however, allowed to reweigh the evidence, retry the facts *de novo*, or substitute its judgment for that of the Commissioner. *Id.*; see also *Watson v. Barnhart*, 288 F.3d 212, 215 (5th Cir.2002). A finding that there is no substantial evidence to support the Commissioner's determination is appropriate only if no credible evidentiary choices or medical findings exist to support the decision, *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir.2000); *Kinash v. Callahan*, 129 F.3d at 738; *Leggett v. Chater*, 67 F.3d 558, 566 (5th Cir.1995), thereby, compelling a "[j]udicial review [that is] deferential without being so obsequious as to be meaningless." *Brown v. Apfel*, 192 F.3d at 496; see also *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir.2002).

### Determining the Existence of an Eligible Disability

■■■ The standard is the same for the judicial review of both Social Security disability insurance and supplemental income cases. See *42 U.S.C. §§ 405(g)* and *1383(c)(3)*. To qualify for disability insurance benefits, the claimant must meet certain insured status requirements; i.e., be under age sixty-five (65), file an application for such benefits, and be under a disability as defined by the Social Security Act. *42*

*U.S.C.* §§ *416(i), 423.* Those claiming disability insurance benefits under the Social Security Act have the burden of proving their disability. *Anthony v. Sullivan,* 954 F.2d 289, 295 (5th Cir.1992); *Demandre v. Califano,* 591 F.2d 1088 (5th Cir.1979).

 "Disability" is a legal status that is determined by the ALJ after evaluating expert medical and vocational findings, however, the ALJ's determination must conform to the legal standards established and be supported by substantial evidence. See *Richardson v. Perales,* 402 U.S. at 401, 91 S.Ct. 1420; *Loza v. Apfel,* 219 F.3d at 389. The inquiry necessarily becomes whether the record, read as a whole, yields such evidence as would allow a reasonable mind to accept the conclusions reached by the ALJ. See *id.* An impairment cannot be assessed as less than severe and accordingly, not disabling, unless it constitutes a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the claimant's ability work, irrespective of age, education or work experience. See *Stone v. Heckler,* 752 F.2d 1099 (5th Cir.1985). It remains, however, the claimant's burden to establish the disability. See *Anthony v. Sullivan,* 954 F.2d at 295; see also *42 U.S.C.* §§ *416, 423.*

To determine the existence of an eligible disability there must, initially, be an evaluation of whether the claimant was unable to perform substantial gainful work existing in the national economy because of a medically determinable physical or mental impairment, which can be expected to result in death, or which has lasted, or which can be expected to last, for a continuous period of not less than twelve (12) consecutive months. 42 U.S.C. §§ 416(1), 423(d)(1)(a), 1614(a)(3)(A); *Barnhart v. Walton,* 535 U.S. 212, 222–25, 122 S.Ct. 1265, 152 L.Ed.2d 330 (2002); *McQueen v. Apfel,* 168 F.3d at 154; *Greenspan v. Shalala,* 38 F.3d 232, 236, *cert. denied,* 514

U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (5th Cir.1995).

A five-step sequential process is utilized by the ALJ to determine whether a claimant qualifies for disability benefits. See *20 C.F.R.* § *404.1520(b)–(f)(1998); Loza v. Apfel,* 219 F.3d at 390; *Leggett v. Chater,* 67 F.3d at 563. The claimant has the burden of establishing the first four steps of the five-step sequential process by establishing a severe impairment which prevents the claimant from performing past relevant work. In this five-step process, the ALJ considers:

1) whether the claimant is currently engaged in substantial gainful activity, as an individual who is working and engaging in substantial gainful activity will not be found disabled, regardless of the medical findings;

2) whether the claimant has a severe impairment;

3) whether the claimant meets or equals a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1, as such an individual will be considered disabled without consideration of vocational factors;

4) if an individual is capable of performing the work they did in the past, a finding of not disabled must be made; and,

5) if an individual's impairment precludes them from performing their past work, other factors, including age, education, past work experience and residual functional capacity must be considered to determine if there is any work in the national economy that the individual can perform.

*20 C.F.R.* § *404.1520(b)–(f);* see also, *Carey v. Apfel,* 230 F.3d 131, 134–5 (5th Cir.2000); *Brown v. Apfel,* 192 F.3d at 498; *Leggett v. Chater,* 67 F.3d at 566.

The Commissioner bears the burden as to the fifth step of the process. See *Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir.2001). If the Commissioner meets this burden, the claimant must then prove that he or she cannot, in fact, perform the alternate work suggested. See *Waters v. Barnhart*, 276 F.3d 716, 718 (5th Cir.2002); *Carey v. Apfel*, 230 F.3d at 135. If, at any step of the analyses, the ALJ finds that the claimant is or is not disabled, the inquiry is terminated. *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987); *Myers v. Apfel*, 238 F.3d at 619.

## DISCUSSION

### *The ALJ Did Not Fail to Properly Consider the Claimant's Alleged Physical and Mental Impairments*

There is no dispute that Doherty did not engage in substantial gainful activity during the relevant period in question, thereby, meeting the first step of the sequential process. (R. 20). At the third step of the process, the ALJ determined that between July 15, 1996 and November 4, 1997, Doherty was disabled, however, his alcoholism was found to be a contributing factor material to his disability resulting in cirrhosis of the liver with esophageal varices, gastritis and depression. After November 4, 1997, Doherty's impairments improved or ceased, and although he could not perform his past relevant work, the impairments were not severe enough, either individually or in combination with the other, to constitute a disability. (R. 14–22).

In seeking a reversal of the denial of his request for social security benefits, Doherty claims that the ALJ's finding that he is not disabled, is not premised upon a proper consideration of his mental and physical impairments. *See* Plaintiff's Complaint (Entry # 1).

### A. Alcoholism was a Contributing Factor Material to the Determination that Doherty was Disabled Between July 15, 1996 and November 4, 1997, Precluding an Award of Benefits

An ALJ has the duty to develop the facts fully and fairly when deliberating a claim for social security benefits and, if the ALJ does not satisfy his duty, his decision is not substantially justified. *Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir.2000)(*quoting Ripley v. Chater*, 67 F.3d at 557); *Carey v. Apfel*, 230 F.3d at 142. In that regard, a treating physician's opinion, diagnoses, and medical evidence should be accorded considerable weight in determining disability, unless there is good cause to find differently. See *Greenspan v. Shalala*, 38 F.3d at 237. It remains, however, that the ALJ has the sole responsibility of determining if a disability exists. See *Loza v. Apfel*, 219 F.3d at 389; *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990).

Doherty does not contest that he has a long history of alcohol dependence. The medical records indicate Doherty related that, as early as 1996, he had at least a fifteen year history of alcohol dependence. Further, Doherty testified that he had been in sobriety since 1997, and that he was still attending Alcoholics Anonymous meetings as a result of his alcohol dependence. (R. 146–154, 175–214, 321–327; T. 47). In 1996, Doherty's treating physician, Dr. Flax, attributed Doherty's liver disease, varices and gastritis to his alcoholism. *Id.* Further, Drs. Liegel and Starbranch attributed Doherty's mental impairments to his alcohol dependence. *Id.* Dr. Flax's discharge diagnosis following the varix band ligation performed in 1997, was that Doherty had alcoholic hepatitis superimposed on cirrhosis of the liver. The record is clear that Doherty's liver cirrhosis was determined alcohol induced.

Doherty's numerous admissions into rehabilitation and treatment centers, including West Oaks Hospital, West Side Psychiatric Hospital, Spring Shadows Glen and Columbia Rosewood Medical Center, were generally to detoxify, manage and monitor his access and dependency on alcohol. (R. 155–174, 215–265, 302–320).

■ The ALJ determined, after reviewing the medical records and with the assistance of the findings of the medical consultants and the conclusions of the medical expert, Dr. Stephen Goldstein, who is board certified in both internal medicine and neurology, that Doherty's impairments of alcoholism, cirrhosis of the liver, esophageal varices, gastritis and depression, were severe from July 15, 1996 through November 4, 1997, sufficiently to meet the requirements of Impairment Listing 12.09, an impairment listed in the Social Security Regulations' Appendix 1, Subpart P, Regulations No. 4 ("Listing of Impairments") and, thereby, constitute a disability. (R. 18; T. 55–57). Unfortunately, the 1996 amendment of the Social Security Act, 42 U.S.C. § 405, *et seq.*, by section 105(a)(2)(A) of the Contract with America Advancement Act ("CAAA"), which mandates that no individual is entitled to an award of social security benefits provided by Title II of the SSA, in those instances in which a finding of disability is premised upon a determination that alcoholism or drug addiction was a contributing factor material to the finding of disability, prevents an award of benefits to Doherty. The ALJ's finding in this instance, that Doherty's alcoholism was a contributing factor material to the disability determination, therefore, precludes Doherty from receiving an award of social security benefits. See *e.g., Brown v. Apfel,* 192 F.3d 492, 499 (5th Cir.1999).[6] As the evidence

supports the ALJ's determination that between July 15, 1996 and November 4, 1997, Doherty was disabled and that alcoholism was a contributing factor material to the finding of disability, the ALJ's decision should be affirmed and, accordingly, Doherty is precluded from receiving benefits for his disabling condition during that time period.

**B. The Medical Evidence Supported the Finding that From November 4, 1997 thru May 20, 1999, the Claimant's Condition Had Improved and He was no Longer Disabled**

Doherty would likely contend that the ALJ failed to properly consider his physical and mental impairments disabling, once he ceased his alcohol dependency. The ALJ, however, determined that as of November 4, 1997, Doherty's condition had improved and he was no longer under a disability as he had the capacity to perform sedentary work in a low stress work environment doing simple repetitive tasks, work the ALJ found existed in significant numbers in the national economy. (R. 14–22).

Doherty testified that he ceased drinking alcohol in August of 1997. (T. 47). The medical records, however, reveal that Doherty was admitted into Spring Shadows Glen on August 27, 1997, for alcohol dependency treatment and was discharged in October of 1997. In September of 1997, the records reflect that Dr. Flax examined Doherty while he was still an inpatient at Spring Shadows Glen. The records reveal, however, that in December of 1997, Doherty had been discharged from Spring Shadows Glen and sober for several months. (R. 155–174, 215–265, 302–320). The ALJ's determination, therefore, that Do-

---

**6.** In *Brown v. Apfel, supra.,* the Court discusses the application of the CCCA to those bene-

fits provided by Title XVI of the SSA.

herty's alcoholism had ceased in November of 1997, is more credible than the August date attested to by Doherty.

Furthermore, it is noted that an MRI of Doherty's brain in early February, 1998, revealed no evidence of a cerebral vascular accident (stroke). The medical records also fail to indicate any evidence of a stroke or damage caused by a stroke, after November 4, 1997. Dr. Daniel Spoor's findings, after examining Doherty in February of 1998, indicated that Doherty had non-severe impairments and that his alcoholism and cirrhosis were in remission. In July of 1998, Doherty himself related to the consulting psychiatrist, Dr. Bowers, that his mood improved, he was more hopeful about the future, and he believed that he was making progress. Dr. Bower's diagnosis was that Doherty's symptoms had improved tremendously and that as long as he remained sober his symptoms would continue to improve. Dr. Phillips' psychiatric assessment comported with that of Dr. Bowers, in that he determined that Doherty had no significant mental limitations, other than his ability to interact with coworkers or peers, which was found to be moderately limited. Dr. Flax, Doherty's treating physician, noted in September of 1998, that he was still abstaining from alcohol and that his liver cirrhosis was dormant as a result. Doherty's liver enzymes were normal and he had no ascites. Further, there is no evidence that Doherty had recurrence of gastritis or varix bleed following his band ligation performed in early 1997. (R. 135, 266–301, 329–340, 348–349, 355–358). Doherty's follow-up examination by Dr. Flax revealed that his chronic liver disease and alcoholism appeared to be under control, which was confirmed by laboratory results. (R. 350–354). The psychological evaluation performed by Dr. J.L. Paterson, the consulting examining psychologist, concluded that Doherty was able to evince a good effort on tasks, and had non-severe de-

pression due to alcohol dependence in full remission, and indicated that Doherty, himself, related that he "was never aware of" his bouts with depression. (R. 359–367). It is clear, therefore, that by the time Doherty returned to work in his construction business in May of 1999, his physical and mental impairments had either ceased or were greatly improved.

The ALJ's determination that Doherty's condition had improved was also supported by the testimony of the medical expert, Dr. Goldstein, as well as the testimony of the vocational expert, Charles Poor, who asserted that Doherty could perform work at the sedentary level if limited to low stress and simple, repetitive tasks. (T. 55, 57,60–61). The ALJ's finding, therefore, that Doherty's physical and mental impairments had greatly improved in November of 1997, following his cessation of alcohol, were no longer disabling and remained non-disabling following his return to work in May of 1999, is premised upon substantial evidence, was without rebuttal, and reflects the ALJ's careful consideration of Doherty's alleged physical and mental impairments.

### CONCLUSION

Following a review of the entire record, it is recommended that the ALJ's decision be affirmed as the findings comport with the applicable legal standards and the substantial evidence, and accordingly, there has not been presented in this matter, a genuine issue necessitating the reversal of the Commissioner's decision or rehearing. It is, therefore,

**RECOMMENDED** that the Commissioner's Motion for Summary Judgment (Entry # 11) be **GRANTED**. Additionally, it is.

**RECOMMENDED** that Final Judgment be entered in favor of the Commis-

sioner and that this matter be **DISMISSED with prejudice** from the Court's docket.

The Clerk shall file this Memorandum and Recommendations and provide the parties a true copy. The failure to file written objections to the proposed findings and recommendations within ten (10) days of the entry of this Memorandum and Recommendations, may bar an aggrieved party, except upon grounds of plain error, from attacking the proposed factual findings and legal conclusions, on appeal. See *Thomas v. Arn,* 474 U.S. 140, 148, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Acuna v. Brown & Root, Inc.,* 200 F.3d 335, 340 (5th Cir.2000); *Douglass v. United Services Automobile Assoc.,* 79 F.3d 1415, 1424 (5th Cir.1996); see also 28 U.S.C. § 636(b)(1)(C).